IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

H.M., individually, and by and through
J.M., natural parent and guardian of H.M.,

     Plaintiffs,

v.                    No. 13-1060

WEAKLEY COUNTY BOARD OF
EDUCATION,

     Defendant.

_____

## ORDER
_____

### INTRODUCTION AND PROCEDURAL BACKGROUND

On October 21, 2008, the Defendant in this case, Weakley County Board of Education (the "Board"), brought an action against the Plaintiffs herein, H.M., individually and by and through J.M., natural parent and guardian of H.M., pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), appealing the decision of Administrative Law Judge ("ALJ") William Jay Reynolds entered on September 22, 2008. (W.D. Tenn, No. 1:08-cv-01254-JDB-cgc ("Case No. 08-1254").) Judge Reynolds found that, based on procedural errors by the Board, J.M. was entitled under the IDEA to reimbursement of certain tuition fees and related costs. In an order entered March 28, 2012, this Court remanded the matter to the ALJ for the purpose of determining whether H.M. suffered from an "emotional disturbance" under the statute. (Case No. 08-1254, D.E. 154.)

On remand, the case was assigned to ALJ Kim Summers,[1] who issued an order on December 19, 2012 finding that H.M. was not emotionally disturbed and, therefore, not a child with a disability under the IDEA. The instant suit is an appeal of Judge Summers' decision, pursuant to the IDEA as well as § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504") and 34 C.F.R. § 104.4, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") and 28 C.F.R. § 35.130. The parties have agreed that this case would be decided on the briefs.

## *FINDINGS OF FACT*[2]

H.M. was born on February 1, 1989 in Murray, Kentucky and attended Weakley County Schools ("WCS") from kindergarten through high school. At the age of nine, unbeknownst to her parents, she was sexually assaulted by an adult. Her grandfather also died around that time. Thereafter, her grades declined and one of her teachers suggested she might have emotional problems. The teacher referred H.M.'s parents to Dr. Carla L. Farr, a counselor in nearby Paducah, Kentucky. H.M. told the counselor what had happened to her and the perpetrator was arrested. At the preliminary hearing, H.M. was called to testify but instead fled the room in tears. Her parents divorced when she was twelve years old, after which she lived with her father. Her mother remarried the following year. Dr. Farr's working diagnosis of H.M. was Axis I[3]: post traumatic

---

[1]Judge Reynolds was terminated from his position as an ALJ by the Tennessee Secretary of State in 2009. Accordingly, he was without authority to hear the case on remand.

[2]The facts set forth herein are essentially the same as those enumerated by the Court in its March 28, 2012 order in Case No. 08-1254. No additional evidence was taken on remand.

[3]DSM-IV utilizes an axial system of diagnosis. "Axis I consists of clinical syndromes; Axis II is personality disorders and mental retardation; Axis IV is psychosocial and environmental problems or stressors in life and Axis V is the Global Assessment of Functioning . . ., a general numeric estimate of how well a person is functioning." *Webb v. TECO Barge Line,*

stress disorder ("PTSD"), parent child relational problem; Axis IV: family conflict, school environment; sexual abuse issues and Axis V: moderate to severe. Dr. Farr saw H.M. from October 25, 2001 through May 28, 2003. Thereafter, it was Dr. Farr's understanding that J.M. would seek help for his daughter as deemed necessary closer to his home. According to J.M., she seemed to "do okay" in middle school.

H.M. began high school at Dresden High School in Dresden, Tennessee. Her father recalled that her grades fluctuated. She was seeing a counselor but was not on medication. According to H.M., she skipped school while at Dresden because she did not like it. In February of her freshman year, she was sexually assaulted by the stepfather of a friend. The man was prosecuted and sent to prison. When H.M. returned to school, she was harassed by the friend and eventually placed in Weakley County's nonpunitive KEEP HOPING program. Although H.M. appeared to be under less stress in the program and felt comfortable there, J.M. objected to the placement for several reasons, including the lack of any repercussions with respect to the other girl, the instigator in his opinion, and the presence of "negative people" to whom his daughter might be drawn. He requested and obtained a transfer to Westview High School in Martin, Tennessee.

While she was at Westview, H.M. called the Weakley County Alternative School stating she was the aunt of a male student and asked to speak with him. A few days later, another call for the same male student was made, this time by an individual identifying herself as Bobbie Doer, a crisis worker. After two more calls to the student, ostensibly from Doer, officials at the alternative school suspected the caller was actually H.M. Alternative school director Joyce Hale contacted Westview,

*Inc.*, No. 07-514-DRH, 2012 WL 780851, at *25 (S.D. Ill. Mar. 7, 2012), *app. dismissed* (7th Cir. July 10, 2012).

asked if H.M. was at school and explained the situation. It was determined that H.M. was at school and that she had made the calls from a cellphone to which she gained access by citing a family emergency. During one of the calls, H.M. and the male student made plans to meet at her father's rental home. When J.M. arrived at the residence, he discovered his daughter and the male inside.

In October 2004, shortly before fall break, J.M. discovered H.M. skipping school with the same boy again and this time had him arrested. He also had H.M. taken before the juvenile judge for truancy. H.M. stated in her deposition that she was angry at her father during this time. According to J.M., there was another student at Westview who had transferred from Dresden High School and who reminded his daughter of the assault. He stated in the due process hearing that she would come home from school in tears, lock herself in her room and refuse to talk. He took her to Carey Counseling Center, Inc. in Union City, Tennessee for evaluation on October 5, 2004. The psychiatric evaluation indicated a long history of depression, nightmares, flashbacks, and irritable outbursts at home. Mary Helen Wood, Ph.D., APRN, BC, noted that H.M. was cooperative and had organized, logical thought process and normal to above-average intellect. The evaluation also reflected worries, fears, thoughts of hopelessness and guilt, depressed mood and severe dysphoric affect. H.M. reported having friends. Wood diagnosed her with PTSD and severe major depression. Zoloft and Seroquel were prescribed and it was requested that she return in six weeks.

In progress notes dated November 3, 2004, Wood referenced concerns voiced by the father about H.M.'s continued depression, vomiting and inability to attend school. She increased the dosage of Zoloft and, along with James Williams, M.D., sent a request to WCS for homebound education due to H.M.'s condition. A homebound application was submitted to WCS on November 8, 2004 stating that H.M. had "significant self-esteem issues" and was unable to attend classes in

regular school because her anxiety level prohibited school attendance and interfered with her concentration, ability to learn new information and interact with others.  (AR00970.)

An Individual Education Program ("IEP") meeting was conducted on November 23, 2004, attended by J.M., WSC Director of Special Education Sue Moore, school counselor Jennifer Martin, the school principal and Pat Bradberry, the homebound teacher.  It was concluded that H.M. would begin homebound education on that date and continue until the beginning of the second semester. It was noted on the IEP meeting form that "Holly's father is trying to place her in a residential facility.  If this placement has not occurred, the IEP committee will meet [at] the beginning of [the second] semester to discuss further educational placement on homebound."  (AR00972.)  J.M. accepted the recommendation.  The IEP noted H.M.'s strengths as "very creative, writing [a] song [and] drawing pictures."  (AR00973.)  The parent's concern regarding his child's education was listed as "Holly's father wants her to reach her potential."  (*Id.*)

During this time, Wood suggested that H.M. see a counselor at Baptist Behavioral Health Care.  The counselor told her that she had been in counseling for two to two-and-a-half years and at some point she needed to stand up and do it on her own.  H.M. attended one or two sessions with this individual and never went back.

In December 2004, on her father's request, H.M. was referred for a comprehensive assessment for determination of eligibility and need of special education services.  J.M.'s stated reason for the request was his daughter's inability to function in the classroom setting and failure to realize her full potential due to past trauma.  On a parent information form dated December 9, 2004, J.M. stated that his daughter was a very smart girl but that "due to events that happened to her she has become emotionally handicapped and is not able to move past these problems."  (AR01011.)

Carey Counseling Center progress notes from that same month revealed stabilized mood, decreased nightmares, good eye contact, appropriate affect and an easy smile. The notes also indicated that J.M. planned to send her to a residential school and that H.M. was still receiving a homebound education. Wood requested a follow-up appointment in twelve weeks. The record contains no evidence of further counseling.

H.M.'s experience with the homebound program was less than positive. Bradberry reported that she frequently did not complete assignments and failed to bring her books to the last two sessions, which were held at her father's Martin, Tennessee home three hours per week. She recalled that H.M. showed her a picture of her boyfriend on her computer. Bradberry noted that H.M. "failed to complete the assigned homework, not because she **could not** do the work, but because she **would not** do the work." (AR00540-41, 01009.) Bradberry recommended the services be discontinued as H.M. was failing every class. On January 11, 2005, H.M. enrolled in Gateway Christian Schools, a homeschool program in Memphis, Tennessee. That same month, J.M. remarried, which, according to his daughter, caused tension between them.

WCS's psychological evaluation was conducted on January 18 and 21, 2005 by school psychologist Kathy Bucy. She interviewed H.M.'s teachers and recorded their observations. Pam Harris, her homeroom teacher, had transferred from Dresden High School and felt H.M. gravitated toward her because they already knew each other. Harris also felt used by the girl. Apparently, it was her cellphone H.M. asked to borrow to call her boyfriend, stating that she needed to call her father. Harris also noted that H.M. "interacted socially and appropriately with her peers; she appeared to have friends. There appeared 'nothing out of the ordinary' in her demeanor." (AR01347.) Biology teacher Rosemary Neville, who H.M. said she hated at the time, advised that

H.M. failed to complete assignments and made excuses for incomplete work.  She also reported that H.M. was "happy, she interacted socially with her peers, and she appeared interested in her personal appearance."  (AR01343.)  Spanish teacher Jaime Romero recalled that she was quiet in his class and frequently did not complete her work.  As the year progressed, she went from being very attentive to "distracted and unfocused," which he believed was normal for teenagers.  (AR01338.)  He also related that she frequently responded to questions with "I don't know" and appeared reluctant to participate.  (AR00995.)  Steve Kilgas, her art instructor, reported that H.M. interacted appropriately with classmates but found frequent excuses to leave class.  Math teacher Ed Baker found her capable and quiet.  According to Baker, she turned in her work when she attended school.  Computer teacher Jeff Kurrus found nothing atypical about her behavior.  Her English instructor, Mrs. Smith, described H.M. as shy and cooperative in working with other students.  School counselor Cathie Holmes and assistant principal Mr. Hurst advised that H.M. often came to them claiming to be unhappy or unwell.  She reported feeling uneasy at her mother's house because of the movies her mother's boyfriend watched.  After a time, the two noticed a pattern in that her visits to them corresponded with her biology class, which she disliked.  They also found her manipulative.  On one occasion, instead of going to class, she went to another classroom to "help" the teacher because Hurst had sent her to do so when he in fact had not.  She often missed the bus and asked teachers to give her a ride home.  Holmes observed that H.M. was "able to interact with others.  She, you know, as a teenager.  Again, I say, she did have problems with some students.  She voiced concerns about that, but I think at the time she had a boyfriend and there were some other kids that she had a relationship with."  (AR00893.)

A report prepared by Bucy with respect to the evaluation also included the responses of J.M.,

H.M. and some of her teachers to the Behavior Assessment System for Children ("BASC"). J.M. reported that his daughter exhibited a number of behavioral and emotional problems resulting in an overall rating in the at-risk range. His ratings on the internalizing problems composite revealed scores in the clinically significant range. He also rated her level of anxiety and depression in the clinically significant range, indicating a high probability for maladjustment. J.M.'s ratings suggested that his daughter displayed physical complaints in the at-risk range on the somatization scale. Teacher evaluations completed by Bradberry and Hale indicated that she exhibited "some behavioral and emotional problems when compared to her peers." (AR01001.) Bucy noted that

> [t]he overall rating of [H.M.'s] behavior fell in the At-Risk range . . . . This rating of [her] overall behavioral functioning is consistent with responses made by [J.M.]. In the Externalizing Problems composite (which includes the following areas: Hyperactivity, Aggression, and Conduct Problems) resulted in scores in the At-Risk range. The teachers' responses on the Internalizing Problems Composite indicate behaviors at the At-Risk range. They rated [H.M.'s] display of Somatization as Average; Anxiety in the At-Risk range; and Depression in the Clinically Significant range. The teachers' ratings on School Problems, Attention Problems, Learning Problems, Adaptive Skills, Social Skills, Leadership Skills, Atypicality, and Withdrawal all fell in the Average Range.

(*Id.*) On the self-reporting portion of the BASC, H.M.'s responses fell into the average range except for somatization, in which she rated at-risk. The responses suggested that H.M. was overly sensitive to physical discomfort and frequently complained.

Bucy's testing also included the Vineland Adaptive Behavior Scale, on which J.M. was the respondent. H.M. scaled moderately low in general adaptive functioning and daily living skills and low in socialization skills. Her score in the maladaptive behavior domain fell into the significant range. Bucy noted that her "overall adaptive skills were significantly lower than expected." (AR01000.)

Holmes testified before Judge Reynolds as follows:

Q:      . . . As her counselor did you see any deterioration in her ability to function as that tenth grade year moved forward?

A:      H.M. was an exceptionally bright young lady. Academically she could function. It's possible that she could have some difficulties with certain things.

Q:      Did you see a decline in her output say, academically as that semester progressed?

A:      Only by what the teachers were telling. As her counselor they would come to me.

Q:      They'd say she was doing poorly, doing less?

A:      They were just concerned and they, you know, and I talk to several students academically if there are some drops in their grades.

Q:      Did you feel like you had a good relationship with H.M.?

A:      I thought we did.

Q:      She trusted you?

A:      As far as trust could go for her, sure.

Q:      Were you at the meeting when they recommended homebound?

A:      I think I was ill that day and my co-worker was there.

Q:      When you came back from that time and found that H.M. was homebound based on the psychiatric report, were you surprised?

A:      Surprised that she was homebound?

Q:      Yes.

A:      I knew she was having some difficulties in school so, you know, I'm sure that was the next step that they were looking into.

(AR00877-78.) Holmes also related that she "did not know we were at the point of her actually wanting homebound." (AR00891.)

9

In an IEP meeting on February 11, 2005, the team reviewed Bucy's report and opined that H.M. did not meet the criteria of an "emotionally disturbed" child with a disability under the IDEA, stating that "[H.M.] is not eligible for special education services at this time. The IEP team discussed several aspects of [her] situation. [Her] emotional difficulties appear to be situational rather than consistent in all aspects of her life. (AR00993.) Issues discussed at the meeting included patterns of avoiding classes, H.M.'s expressed desire to return to the KEEP HOPING program, and lack of dysfunctional behaviors with peers unaware of her past traumas. The team also discussed possible measures that might be utilized if H.M. returned to Westview, including having a regularly scheduled time with the school counselor and being visited through the Student Assistance Program. J.M. reserved the right to request another IEP meeting if interventions upon her return to Westview were unsuccessful.

At Gateway, H.M. studied at home and went to a "brick and mortar" office weekly for testing on the work she had been assigned. Gateway had no psychological or counseling component. Her grades consisted of four Cs, three Ds and one F.

A month after the IEP meeting, H.M. ran away from home with a young man. During that runaway, she was sexually assaulted by the cab driver who had driven the two to Paducah. When the police returned her home shortly thereafter, her father had her admitted to Three Springs Residential Treatment Center in Trenton, Alabama on March 11, 2005, where she remained until July 2005. At the facility, she participated in classroom instruction and passed all her classes except for algebra, receiving one and one-half units of credit. In an initial assessment dated March 23, 2005, Three Springs psychologist Barbara H. Jacobs, Ph.D. reported that

> [s]he feels she has been depressed since she was nine years old (when the first abuse happened, and when her grandfather died). She says she has thought about suicide

> "every day" for a long time.  She has cut her wrist a few times since ninth grade, with a steak knife, and she said she has "gashed her throat" with a carpet knife, right before tenth grade started.  She also said she has considered shooting herself with either her father's pistol or her stepfather's Colt 45, which she has held loaded, but "couldn't pull the trigger."

(AR01027.)  Based on the available information, it was concluded that long-term treatment was appropriate.

An initial psychiatric evaluation was prepared by Sarah Boxley, M.D. on April 14, 2005.  Dr. Boxley reported that

> [H.M.] is alert and oriented.  Her cognition is intact.  She is casually dressed and fairly groomed . . . .  Her speech is normal in rate, volume, and tone.  No psychomotor agitation was noted.  Her eye contact is fair.  She describes her mood as "good."  Her affect appears congruent.  Her thoughts are organized and goal oriented.  There are no auditory or visual hallucinations and no delusions.  There is no suicidal ideation or homicidal ideation.  There is no indication of obsessions or compulsions.  There is no indication of history of eating disorder.  There is no panic disorder.  There is a history of some self-injurious behavior, cutting her wrist in the past.  There is none currently.  There is a history of nightmares in the past regarding the abuse.  There is also a history of some reoccurring thoughts of the abuse.

(AR01024.)  The diagnosis was Axis I:  oppositional defiant disorder; major depression, recurrent, moderate; parent child relational problems; alcohol abuse; sexual abuse of a child victim issues and PTSD symptoms and Axis IV:  severe stressors, history of childhood sexual abuse, parents' divorce, difficulty with academics and difficulty with peer relations.

A subsequent psychological evaluation was performed by Dr. Jacobs on May 4, 2005.  With respect to the suicidal incidents referred to in her initial assessment, Dr. Jacobs stated that H.M. "seemed to be dramatizing some of her feelings and 'story telling' about some of these situations." (AR01031.)  Dr. Jacobs utilized the Millon Adolescent Clinical Inventory ("MACI"), a self-report, paper and pencil personality inventory in performing a personality assessment of H.M.  The psychologist concluded that "[v]alidity indicators show that [H.M.] endorsed so many problems and

to such a great extent that the entire test profile was nearly invalidated. This type of over-endorsement of problems is sometimes done for attention-seeking or secondary gain purposes (i.e., being removed from a treatment program), and this motivation must be considered in [H.M.'s] situation due to the unrealistic nature of her item endorsements." (*Id.*) She went on to note that "[t]he test protocol indicates an adolescent who has gone overboard in the test answers to emphasize her self-critical attitudes, her suicidal ideation, and her apathetic, discouraged mood. She emphasizes her introversion and reluctance to relate to others and her poor self-image." (*Id.*) Dr. Jacobs summarized and recommended as follows:

> The personality testing was marked by such extreme negative self-statements and such extreme over-endorsement of problem areas that [H.M.'s] motivation is questioned. Such over-endorsement ("fake bad" profiles) of problems is often done for motives such as self-interest, attention-seeking, sympathy, or to accomplish some aim like removal from treatment.

> The MACI interpretive material points out that it is often difficult in such situations to separate the true problems from the exaggeration.

> The test results confirm, in my opinion, the necessity for long term residential treatment for [H.M.]. She needs the supervised group process and the structured environment, which isn't open to her manipulations. She can benefit from the program's special groups on sexual abuse issues and on substance use prevention.

> Communication with her biological parents and her step-parents will be an important aspect of her program.

> I strongly recommend that she be required to complete and graduate this program, and that her family stand strongly behind that goal. In my opinion, [H.M.] will seek to manipulate one or both biological parents to accomplish her goal of getting out of treatment and back to the boyfriend she misses so much.

(AR01032.) It was noted in her Three Springs treatment plan that she sought out people with worse problems and boys who were older and in trouble. The treatment plan also indicated that H.M. had underachievement and learning problems shown by a drop in school grades from A-B to B-C "and

then 'headed rapidly toward failing 10th grade.'" (AR01040.) The plan noted failure to hand in work, cheating and skipping school, as well as a "[r]ecurrent pattern of acting-out, disruptive, negative attention-seeking behaviors in [the] academic setting[.]" (*Id.*)

According to H.M., she began to cut herself while at Three Springs in an effort to go home. She denied ever having done it before and characterized it as an "act." When it was determined by staff that she had become a danger to herself and others, she was transferred to sister facility Three Springs, New Beginnings, which had higher security, where she had to be restrained numerous times.

In her discharge summary prepared by Three Springs, the following observations were made with respect to learning issues and depression:

> [H.M.] maintained an A-B average in her classes, and she worked well in school (i.e. following directions). Teachers reported that she had average grades, and followed school standards while in school. She was confronted in school for working on a topic or letter instead of schoolwork. [H.M.] sought attention in school, and was inappropriate and disrespectful when arguing with her teacher.

> [H.M.] expressed about her depression in a topic. She said she has been depressed for a long time starting at the age of nine because she was going through a lot then. She said she feels like she gets depressed easily and thinking about it makes her depressed. Though [H.M.] lacked motivation through most or all of her stay at Three Springs, she did not appear depressed, and her moods were fairly stable. The self-injurious incidents that happened during the last 4 days of [her] stay at Three Springs appeared to be manipulative-based rather than depression.

(AR01051.) It was recommended that H.M. attend a small school with a small teacher-student ratio and that she have regular counseling with parent participation.

J.M. retained an education consultant, Dr. Andy Erkis, while H.M. was at Three Springs. According to his resume, Dr. Erkis is a psychologist who locates appropriate placements for individuals with particular needs. When asked during an evidentiary hearing before Judge Reynolds

concerning what he determined with respect to H.M.'s needs, he responded thusly:

> Well, the review of the records and certainly the most salient thing was for me she was in a space, she was in a program that is really designed and it's a very, it's a fine, well respected program designed for girls who are a little bit more behavioral and this is where it gets a little bit shades of gray so I, when I would send, if I were to send a girl to a Three Springs program it would be a girl who was really just -- it was less about mental health issues and more about behavioral issues. She was in a placement that -- And yeah, it was pretty clear she was acting out. She had been restrained several times while she was there. She was struggling. She was having nightmares. She was having PTSD symptoms. So they moved her to their kind of sub-acute unit there and my job then at that point was to say all right, what's the best spot for her?

(AR00805-06.)

On Dr. Erkis's recommendation, J.M. placed his daughter at High Frontier Residential Treatment Center in Fort Davis, Texas ("High Frontier"). H.M. was certified as Emotionally Disturbed ("ED") at High Frontier. Its school psychologist, Dr. Jerry Mitchell, stated that

> [a]s I first met her she was rather subdued. She was open about and volunteered information readily. She had I would say, if you would, that she had probably a poor self image if that's what you're asking. She had not succeeded at anything in quite some time. She had been traumatized and to go back and to specify what I'm talking about she reported that she had been sexually abused. She'd had school problems, she'd been depressed, she had flashbacks of abuse, she had nightmares and that's the condition that I found when I first interviewed her.

(AR00681.) According to its clinical director, Rebecca Wren, High Frontier is a residential treatment center for ED students who require special education in a residential setting. She explained that "we're looking at the least restrictive environment and if the child's records and so forth show that an environment less restrictive than ours is appropriate then we would not take them." (AR00754.) Dr. Mitchell explained that psychological testing is performed "before they come in so that we can evaluate whether they should be here." (AR000674.) Dr. Larry Butler, superintendent of the Fort Davis Independent School District, stated in his deposition that, once a

parent has agreed to testing, "[t]hose are brought to the [Admissions Review Decision] committee, discussed, and to check and see if there is educational need and qualifying based on the test results for special services." (AE0000561.) Dr. Mitchell's process was to "review the recent psychiatric and psychological evaluations and to interview her myself." (AR00675.) The teachers at High Frontier are provided by the local school district and are certified in special education. H.M. graduated from the school with high honors and was accepted at Murray State University in Murray, Kentucky for the fall of 2007.

In April 2009, subsequent to the issuance of Judge Reynolds' determination, WCS contacted Dr. Warren Thompson, requesting that he review the case and prepare a report. It was his opinion that H.M. exhibited none of the characteristics of one who was emotionally disturbed.

*DECISION OF JUDGE SUMMERS*

Upon review of the evidence, Judge Summers made the following conclusions of law:

1. It is clear that H.M. has had more than her fair share of personal difficulties in her young life that she has had to overcome.

2. While the preponderance of the evidence clearly shows that these personal difficulties have indeed impacted H.M.'s behavior, much to her credit, the evidence does not prove that H.M. was, in fact, "emotionally disturbed."

3. J.M. tacitly conceded that H.M. is not emotionally disturbed in February 2005 by failing to contest the denial of services following the IEP meeting with the school system.

4. The facts existing at the time of the denial support the conclusion by WCS that H.M. was not "emotionally disturbed."

5. Notwithstanding her personal difficulties, H.M.'s counselors and teachers generally found her to be academically capable, social and interactive with peers, but manipulative.

6. Although H.M. was clearly more interested in skipping school with her friends than attending class and doing her school work, the preponderance of

the evidence does not prove that H.M.'s lack of motivation for her school work was caused by her personal difficulties.

7.    The last evaluation from the Carey Counseling Center in December 2004, just two months or so before the IEP evaluation, indicated that H.M.'s condition had improved.  Another appointment for H.M. was recommended for twelve weeks out.  No additional appointments were scheduled.

8.    H.M.'s conduct leading up to the IEP evaluation suggests an individual who is "socially maladjusted" rather than "emotionally disturbed."

9.    Although J.M. did not dispute the finding by WCS that H.M. is not emotionally disturbed, and later argued that the sexual assault in Kentucky was irrelevant to the determination of H.M.'s eligibility for services, J.M. placed H.M. in a residential facility within days of the assault.

10.   There was no ability to assess what impact, if any, the assault might have on H.M.'s emotional/psychological state and, ultimately, her educational performance.

11.   Notwithstanding the diagnosis of "emotionally disturbed" by High Frontier Residential Treatment Center, there was little to no indication of depression or emotional instability.  Instead, H.M. was found to be manipulative and to be embellishing her difficulties in order to gain attention and to get released from the facility.

12.   The preponderance of the evidence does not suggest that H.M. was unable to "get to her goals," but that her goals were, at that time, just "socially maladjusted."

*CONCLUSIONS OF LAW*

ADA.

Although the Plaintiffs alleged violation of the ADA in their complaint, no mention of the claim was included in their trial briefs.  Thus, as the Court is left to assume that the claim has been abandoned, it is DISMISSED.

IDEA.

In order to determine whether the IDEA has been violated, a district court applies a modified

*de novo* standard of review. *N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 614 (6th Cir. 2014). Under this standard, the court "may not simply adopt the state administrative findings without an independent re-examination of the evidence, nor may [it] substitute [its] own notions of sound educational policy for those of the school authorities which they review." *Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 973 (6th Cir. 2012) (internal quotation marks omitted).

As noted above, Judge Summers was tasked with addressing the issue of whether H.M. was a "child with a disability" for purposes of the IDEA. A child with a disability includes one suffering from "emotional disturbance," "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A). "Emotional disturbance" has been defined in the Code of Federal Regulations as

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>
> (C) Inappropriate types of behavior or feelings under normal circumstances.
>
> (D) A general pervasive mood of unhappiness or depression.
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i). The "term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under" subsection (c)(4)(i). 34 C.F.R. § 300.8(c)(4)(ii). It was the conclusion of this Court in Case No. 08-1254 that Judge Reynolds merely assumed H.M. was emotionally disturbed while failing to make any findings as

to whether any of the enumerated characteristics actually applied to her. Upon her review of the evidence, Judge Summers opined that H.M. was socially maladjusted without emotional disturbance.

The Plaintiffs first argue that the Court should defer to Judge Reynolds's "credibility-based findings," since he actually heard the evidence, while Judge Summers merely ruled from a cold record. In support of their position, Plaintiffs cite to *Carlisle Area School v. Scott P. by and through Bess P.*, 62 F.3d 520 (3d Cir. 1995), in which the Third Circuit Court of Appeals assumed without deciding that "a district court should accord somewhat less consideration to an appeals panel ruling that disregards a hearing officer's credibility judgments[.]" *Scott P.*, 62 F.3d at 529. However, the suit at bar is clearly distinguishable, as it involves not a hearing officer and an appeals panel, but two hearing officers.[4] Moreover, it was the *absence* of findings by Judge Reynolds on the issue of whether H.M. was emotionally disturbed that prompted the remand in the first instance. Thus, on that question, there are no findings of Judge Reynolds to which to defer. It is also noteworthy that this Court, in Case No. 08-1254, and Judge Summers considered additional evidence unavailable to Judge Reynolds.

Second, Plaintiffs contend that Judge Summers's conclusion that H.M. was socially maladjusted alone and, therefore, not a child with a disability, was in error, as she also exhibited at least two of the characteristics necessary for a finding of emotional disturbance: inappropriate types of behavior or feelings under normal circumstances and a general pervasive mood of unhappiness or depression. The characteristics must have been exhibited to a marked degree, must have lasted for a long period of time and must have adversely affected her educational performance. 34 C.F.R. § 300.8(c)(4)(i).

---

[4]The Plaintiffs also cite to cases from various other circuit courts, all of which involved a fact pattern similar to that presented in *Scott P.*

Although "socially maladjusted" is not specifically defined by the statute, the Fourth Circuit's decision in *Springer v. Fairfax County School Board*, 134 F.3d 659 (4th Cir. 1998) is informative. The court defined the term as "continued misbehavior outside acceptable norms" and "a persistent pattern of violating societal norms with lots of truancy, substance abuse, i.e., a perpetual struggle with authority, easily frustrated, impulsive, and manipulative." *Springer*, 134 F.3d at 664. The court went on to articulate that

> [c]ourts and special education authorities have routinely declined . . . to equate conduct disorders or social maladjustment with serious emotional disturbance. . . . [T]he regulatory framework under IDEA pointedly carves out "socially maladjusted" behavior from the definition of serious emotional disturbance. This exclusion makes perfect sense when one considers the population targeted by the statute. Teenagers, for instance, can be a wild and unruly bunch. Adolescence is, almost by definition, a time of social maladjustment for many people. Thus, a "bad conduct" definition of serious emotional disturbance might include almost as many people in special education as it excluded. Any definition that equated simple bad behavior with serious emotional disturbance would exponentially enlarge the burden IDEA places on state and local education authorities. Among other things, such a definition would require the schools to dispense criminal justice rather than special education. . . . It is not intended to be the duty of special education to *force* socially maladjusted children to school by residentially placing them if they choose to remain truant. Programs within other political divisions, such as the Juvenile Justice system, *must* address this serious problem. If they do not, then Congress should act to place this duty clearly.

*Id.* (internal citations & some quotation marks omitted).

Until the tenth grade, Edward Springer was an average student in the Fairfax County, Virginia public schools who maintained positive relationships with his teachers and peers and participated in community and school activities. *Id.* at 661. In his junior year, however, he sneaked out of his parents' home to stay out all night with his friends; regularly used marijuana and alcohol; and was arrested for possessing burglary tools, tampering with an automobile and stealing a car. *Id.* He was also frequently absent from school and was disciplined for reckless driving on school

property, cutting classes, forgery, leaving school grounds without permission and fighting. *Id.*

Springer's parents transferred their son to a private residential school and requested that the Fairfax

County School Board fund the placement, claiming that he suffered an emotional disturbance and,

therefore, qualified as a child with a disability under the IDEA. *Id.*

There appears to have been no question that Springer was socially maladjusted. *Id.* at 664.

His parents argued, however, that he also exhibited "a general pervasive mood of unhappiness or

depression." *Id.* at 665. The court disagreed, noting that, of the three psychologists who examined

him, none concluded that he was emotionally disturbed. *Id.* The only contrary evidence consisted

of a "sketchy" and "incomplete" letter from a psychiatrist who diagnosed Springer with dysthymia,

a mild to moderate form of depression "clinically defined as less severe than a major depressive

disorder." *Id.* at 666.

*Springer* was cited by Judge Summers and appears to have strongly influenced her

determination that H.M. was not a child with a disability.[5] While this Court agrees with the ALJ that

the evidence indicates that H.M. was socially maladjusted, there was also substantial proof in the

record that she was emotionally disturbed in at least one category -- a general pervasive mood of

unhappiness or depression. Thus, this case is clearly distinguishable from *Springer*. The evidence

reflects that H.M. had suffered from depression since she was nine years old. Dr. Farr diagnosed

her with PTSD as early as 2003. Dr. Wood at Carey Counseling Center also diagnosed PTSD, along

with severe major depression. At that time, H.M. was placed on antidepressant drugs. Her

homebound education application of 2004 reflected that she was unable to attend a regular school

because her anxiety level interfered with her concentration. WCS's own report reflected an overall

---

[5]Indeed, *Springer* was the only case cited by the ALJ.

rating by her teachers as "at-risk" with "Depression in the Clinically Significant range," as well as low adaptive skills. In 2005, Dr. Boxley diagnosed, among other things, major depression, PTSD and difficulty with academics. Even though Dr. Jacobs concluded later that year that H.M. was exaggerating and making up some of her problems, she nonetheless recommended long-term residential treatment, noting that H.M. could benefit from the program's special groups on sexual abuse issues. Dr. Jacobs' treatment plan highlighted H.M.'s underachievement and learning difficulties evidenced by her falling grades during the junior year; her failure to hand in work, cheating and skipping school; and a "recurrent pattern of acting-out, disruptive, negative attention-seeking behaviors in the academic setting." When placed in a private school where she could obtain treatment, she improved, graduating with high honors from High Frontier.

In her conclusions of law, which ran little over a page in length, Judge Summers focused on H.M.'s negative conduct behaviors. The ALJ appeared to cherry-pick evidence in the record that pointed to a similarity between this case and *Springer* while dismissing proof that distinguished the two. No other caselaw was cited to support her conclusions.[6]

Reviewing H.M.'s eligibility under this Circuit's modified *de novo* standard, the Court finds, based on the entire record, it is more likely than not that her major depression, not just her misconduct and manipulation, underlay her difficulties at school. The evidence also reflects that her depression had lasted for a long time, was marked and affected her performance at school. Accordingly, the Court finds that Judge Summers erred in finding that H.M. was not emotionally

---

[6]It is the Court's view that Judge Summers's opinion, in light of its factual selectivity and inadequate legal analysis, is entitled to limited deference. *See Forest Grove Sch. Dist. v. Student*, Civ. No. 3:12-cv-01837-AC, 2014 WL 2592654, at *12 (D. Or. June 9, 2014) ("Because the ALJ's opinion is factually selective to the detriment of an accurate factual record and inadequately develops the applicable legal standards, the court affords the ALJ's opinion little deference.").

disturbed for purposes of the statute and, therefore, a child with a disability. The decision of Judge Summers is, therefore, REVERSED. This matter is REMANDED to the ALJ for proceedings consistent with this opinion and those entered in Case No. 08-1254. The ALJ is also directed to consider the preclusive effect, if any, of Judge Reynolds's decision with respect to that determination. Finally, the ALJ is to address Plaintiffs' claim under Section 504 if he or she concludes that said claim is properly before him or her.[7]

IT IS SO ORDERED this 13th day of March 2015.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[7]Therefore, the Court will not address the Section 504 claims herein.